## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. **01 - 8060**

## CIV - DIMITROULEAS

MAGISTRATE JUDGE
JOHNSON

**GREGORY J. HALL**
**ARCADIA RESOURCES, LTD.**



### PLAINTIFFS

**VERSUS**

**MARK COHEN, CHARLES H. WEAVER,**
**CREAI ACTION SERVICE, SUMMERFIELD INTERNATIONAL**
**SERVICES, INC., MAJESTIC ROSE, INC., SENTRY**
**OVERSEAS (BAHAMAS) INC., T.M.I. GENERATING,**
**CREAI-COHEN, A JOINT VENTURE**

### DEFENDANTS

**********************************************************************************

### COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs allege upon information and belief, except as to those paragraphs relating to the

Plaintiffs that are alleged upon personal knowledge, the following:

### JURISDICTION AND VENUE

1. This Court has personal and subject matter jurisdiction over the action pursuant to

Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78aa and pursuant to 28

U.S.C. Sec. 1331.

1



2.  Venue is proper in this judicial district pursuant to Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. 78aa, because acts, transactions, and occurrences alleged herein making up the violations occurred in this district, including the knowing and reckless employment of devices, schemes and artifices to defraud, the engagement in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiff investors, and the making of untrue statements of material facts and the omission to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. Venue is also proper in this judicial district pursuant to 28 U.S.C.1391(b)(2).

3.  In connection with the acts, transactions, and occurrences referred to in Paragraph 2 above and described in detail in this Complaint, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce to wit: wire transmissions and telephone communications, and the mails.

## THE PARTIES

**PLAINTIFFS:**

4.  Plaintiff Gregory J. Hall is one of the Plaintiff investors who was offered investment contracts by Defendants and is a citizen of Canada, domiciled in Toronto, Ontario,

5.  Plaintiff Arcadia Resources, Ltd. is an entity organized under the laws of the British West Indies that was formed by Plaintiff investors, many of whom are citizens of the United States, at the request and direction of Defendants Mark Cohen and Charles H. Weaver for the purpose of accumulating the funds of Plaintiff investors to purchase the investment contracts

2

offered and sold to Plaintiff investors by Defendants.

## DEFENDANTS AND CO-CONSPIRATORS:

6. Defendant and Co-Conspirator Mark Cohen is a co-owner of Defendant Summerfield International Services, Inc., a Special Director and a Special Financial Manager of Defendant Creai Action Service, who is domiciled in the city of Boca Raton, State of Florida. Cohen's telephone number was 561-997-2484, and his fax number was 561-988-9694.

7. Defendant and Co-Conspirator Charles H. Weaver is a co-owner of Defendant Summerfield International Services, Inc., a Special Director and a Special Financial Manager of Defendant Creai Action Service, who is domiciled in city of Raleigh, State of North Carolina. Weaver's telephone number was 919-847-8768, and his fax number was 919-676-7025.

8. Defendant and Co-Conspirator Creai Action Service is a legal entity organized under the laws of France. Creai Action Service was formed to offer investment contracts to investors and to receive funds from investors, including funds invested by Plaintiff investors and other investors not parties to this action. Creai Action Service is still holding the funds invested by Plaintiff investors and other investors not parties to this action. Creai Action Service was to profit from the use of funds belonging to Plaintiff investors and other investors. The President and Controlling Person of Creai Action Service is Jean-Pierre Martinez. Defendant Cohen is the Treasurer of Creai Action Service.

9. Defendant and Co-Conspirator Summerfield International Services, Inc. is a corporation organized under the laws of the commonwealth of the Bahamas. It was an investment-advisory and a broker-dealer service that was unlicenced. Summerfield was owned by

3

Defendants Charles Weaver and Mark Cohen. Summerfield was formed to receive funds invested by Plaintiff investors and other investors not parties to this action, to profit from the use of these funds, and to make "Ponzi" payments of so-called profits to investors.

10. Defendant and Co-Conspirator Majestic Rose, Inc. is a corporation organized under the laws of the commonwealth of the Bahamas. Majestic Rose was formed and owned by Defendant Cohen to receive the funds invested by Plaintiff investors and other investors not parties to this action.

11. Defendant and Co-Conspirator Sentry Overseas (Bahamas), Inc. is a corporation organized under the laws of the commonwealth of the Bahamas. It was formed and owned by Defendant Cohen to receive the funds invested by Plaintiff investors and other investors.

12. Defendant and Co-Conspirator T.M.I. Generating is a corporation organized under the laws of the commonwealth of the Bahamas. It was formed and owned by Defendant Cohen to receive funds invested by Plaintiff investors and other investors.

13. Defendant and Co-Conspirator Creai-Cohen, was a Joint Venture established by Defendants Creai Action Service , Cohen, Weaver, and Summerfield to receive funds invested by Plaintiff investors and other investors, to transfer those funds to Creai Action Service to allow Creai Action Service to profit from the use of these funds.

14. The Defendants named above conspired with each other and with others not named as Defendants to carry out the scheme to defraud described herein.

15. When Defendants entered into contracts and agreements with Plaintiff investors and when Defendants accepted the funds of Plaintiff investors, Defendants became fiduciaries of Plaintiff investors and, thus, owed Plaintiff investors a fiduciary duty not to make material

4

misrepresentations to Plaintiff investors and not to make omissions of material facts to Plaintiff

investors in reference to the initial and subsequent investment contracts Defendants induced

Plaintiff investors to purchase.  A great number of the statements and representations made to

Plaintiff investors by Defendants were false and misleading because omissions of material fact

were made in these statements and representations for the purpose of deceiving Plaintiff investors

into purchasing all of these investment contracts and for the purpose of lulling Plaintiff investors

into believing that payments of profits and the return of their principal would be forthcoming

when the trading ended.

## FACTS COMMON TO ALL COUNTS

16.  In February, 1998, Albert Bart Jennings, a friend of  Plaintiff  Greg Hall and his

brother, Michael Hall, told them of the "major investment opportunities in bank debenture trading

programs involving European banks."  Jennings said that he had recently learned about the huge

profits that can be earned by participating in these bank debenture trading programs at a seminar

in Cancun, Mexico.  Jennings told Greg and Michael Hall that Defendant Mark Cohen sponsored

these bank debenture trading programs and volunteered to put them in touch with Defendant

Cohen.

17.  Thereafter, a conference telephone call took place between  Greg and Michael Hall,

Jennings, and Defendant Mark Cohen.  Using the instrumentalities of interstate commerce, Cohen

engaged in this conference call from his home in Boca Raton, Florida.  Cohen advised the Halls

that he was a lawyer and described medium term bank debenture trading programs.  Defendant

Cohen said that after World War II, a plan was developed to rebuild Europe, the Marshall Plan.

Part of the Marshall Plan, Cohen stated, was the quiet establishment of these bank debenture trading programs to aid the European banks. Cohen advised that after the war, the Catholic Church got involved in these trading programs and "word" of these trading programs spread. As a result, Cohen stated, the trading programs became available to "knowledgeable" people.

18. Defendant Cohen represented in this telephone conversation that he had sponsored and participated in these medium term bank debenture trading programs for the past five years, and that he had made a lot of money for his "friends and family." Plaintiff investors have very recently learned that these representations were false. Cohen had done no such thing. Cohen further described the "enormous" profits that he could earn in these trading programs and related, by way of example, that he had made the United States Diocese of the Greek Orthodox Church a 1000% profit on a $ 1 million investment the Diocese had made with him. Cohen's representations here were false. He had never earned enormous profits, or any profits, from such trading programs. Trading programs returning these kind of profits do not exist. Cohen went on to explain that he was able to do this by using the $ 1 million investment to lease $100 million for one year. This representation is false. Experts in international finance have testified in legal proceedings that one cannot lease $100 million for $1 million.

19. During that telephone conversation, Defendant Cohen also represented that another investor had made so much money that he had been able to purchase a Coco-Cola bottling plant with the profits he derived from participation in one of Cohen's medium term bank debenture trading programs. For the reasons stated above, this representation was false. Defendant Cohen told Greg and Michael Hall that he would "permit" the Halls and their friends to purchase investment contracts in medium term bank debenture trading programs that Cohen was offering.

6

Cohen represented that the their funds would always remain in an account in a AAA rated bank, or their investment funds would be placed in an banking instrument with a value equal to 100% of their funds. Cohen advised that he worked on a commission basis, being paid a percentage of the profits earned from his trading in medium terms bank debentures.

20. Defendant Cohen advised that, because the profits would be so enormous, all participants in his bank debenture trading programs had to establish a charitable organization to receive a portion of these profits that would be earned from Cohen's investment contracts. Cohe's representation was false. Enormous profits from such fictitious programs do not exist. Cohen represented that although the Securities and Exchange Commission had no jurisdiction over these bank debenture trading programs, he worked directly with the Federal Reserve, and that he had a contact within the "Fed" he referred to as "Uncle." Cohen's statement about working with the Federal Reserve in regard to these trading programs was false. The Federal Reserve denies the existence of these programs and, further, it has no jurisdiction over financial transactions in foreign countries. Cohen represented that these investment contracts could be "rolled over three times" before the Fed would place restrictions on Cohen's trading. For the same reasons stated above, these representations were false. Cohen represented that he had partners who worked with him in sponsoring these medium term bank debenture trading programs, the most prominent of whom was Defendant and Co-Conspirator Charles H. Weaver, who was, Cohen represented, an experienced and successful trader in medium term bank debentures.

21. Defendant Cohen advised that he had graduated from the London School of Economics. He had later been hired by the U. S. S. R. to render a legal opinion on bank

7

debenture trading programs. Cohen represented that the U. S. S. R. had introduced him to Barclay's Bank in London, England, where he established a trading account to trade bank debentures.

22. Defendant Cohn convinced Greg and Michael Hall that medium term bank debenture trading programs were excellent investments that would return enormous profits for the Halls and their friends. Cohen urged the Halls to contact their friends, many of whom are citizens of the United States, and tell them what Cohen had told them, and get their friends to purchase the investment contracts that Cohen and Weaver were offering. Only just before this action was filed did Plaintiff investors learn that Defendant Cohen's representations, described above, had been false and misleading, and had been made in reckless disregard of the truth since no such medium terms bank debenture trading programs that offered the enormous profits promised by Defendant Cohen existed. Plaintiff investors also just recently learned that Cohen's representations described above were replete with omissions of material facts that made those representations false and misleading and in reckless disregard for the truth.

23. Defendant Cohen, using the instrumentalities of interstate commerce, sent a document by wire transmission from his home in Boca Raton, Florida to Greg Hall to forward to potential investors describing "possible investment opportunities." In this document, Cohen described "numerous opportunities" available depending upon the "amount of investment." The document established that profits from trading in medium term bank debentures would be apportioned 50% to the investors and 50% to Cohen and his partners.

24. As directed by Cohen, Greg and Michael Hall talked to their friends, who became Plaintiff investors, and repeated Cohen's representations about medium term bank debenture

8

trading programs that Cohen had made.  Thereafter, using the instrumentalities of interstate

commerce, Defendant Cohen, from his home in Boca Raton, Florida, engaged in at least a dozen

conference telephone calls with Plaintiff investors.   In these telephone conversations, Cohen

repeated his previous representations described above, and built upon them by describing his

successes on behalf of other investors wherein he had earned enormous profits for them from their

purchase of Cohen's investment contracts in medium term bank debenture trading programs. For

the reasons described above, Cohen's representations here were false and misleading and made in

reckless disregard for the truth.

25.  During these telephone conversations, Cohen elaborated upon his skills and

experience in these bank debenture trading programs. Cohen represented that he was currently

involved in several medium term bank debenture trading programs and that "things were going

very well."  Cohen represented to the Halls and the other Plaintiff investors that he had recently

"completed another transaction with $ 2 billion placed and traded." Cohen's statements here were

utterly false.  He simply had not accomplished these things.

26.  During these telephone conversations with Cohen from his home in Florida,

Defendant Cohen informed Plaintiff investors, many of whom are citizens of the United States,

that Plaintiff investors would be required to form an off-shore entity and accumulate their funds in

the off-shore entity which was, in turn, to purchase the investment contracts from Defendants

Cohen, Weaver, and their partners.  Defendants Cohen and Weaver would use these legal entities

in carrying out Defendants' scheme to defraud:  Majestic Rose, Inc., Summerfield International

Services, Inc., Sentry Overseas (Bahamas) Inc., T. M. I. Generating, and Creai Action Service.

Pursuant to Defendant Cohen's instructions, Plaintiff investors formed Arcadia Resources, Ltd. in

9

Nevis, West Indies.

27. On July 6, 1998, Defendant Cohen, using the instrumentalities of interstate commerce, sent a document by wire transmission from his home in Boca Raton, Florida, to Plaintiff investors entitled "Agreement." Cohen's document stated that he and his partners had "access to certain financial investment opportunities" that they would make available to Plaintiff investors including "trading in medium term notes of 'A+' or better rated banking institutions as rated by Standard and Poor's or Moody's." Cohen and his partners represented that they would be using Plaintiffs' funds to trade in "medium term bank debentures." Cohen's document provided that profits from this trading would be split 50-50. The document required the parties to be bound by the "non-circumvention and non-disclosure provisions of the International Chamber of Commerce, Paris, France...and...the (p)arties...will not try to circumvent or contact the other's referrals, banks, or other contacts without written consent." The Agreement provided that Cohen and his partners could make "no investment or other distribution of the (f)und...unless...there is a guarantee at least equal in principal amount to the funds distributed or invested (the 'Guarantee')...All guarantees issued shall be from an institution rated a minimum of A+ by Standard and Poor's or Moody's Investment Services and issued by banks or institutions organized in Western Europe or North America...." This provision was supposed to assure the continued safety of Plaintiff investors' funds. This document constituted an investment contract and thus a security under the laws of the United States.

28. Using the instrumentalities of interstate commerce, from his home in Raleigh, North Carolina, Defendant Weaver engaged in various telephone conference calls with Plaintiff investors during which Weaver represented that he had substantial expertise and experience in medium

10

terms bank debenture trading programs. Weaver represented that he could do a number of trades each day. He assured Plaintiff investors that their funds would always be secure because "he always had a buyer before he trades." Weaver represented that he would be the "trader" trading these bank debentures using Plaintiff investors' funds. Weaver told Plaintiff investors that the United States Treasury and the "Fed" were involved in these programs. Weaver represented to Plaintiff investors that he could make a profit of one percent per day and would use the profits for trading since that would give their profits a compounding effect. Weaver's representations were false and misleading and made in reckless disregard for the truth. Medium term bank debenture trading programs that offer these kinds of profits he described simply do not exist. The United States Treasury and the Federal Reserve System,. when asked about this issue, have stated that these programs do not exist. Thus, of course, they are not involved in these programs.

29. Although Plaintiff investors had been convinced of the existence of and the enormous profitability of these medium term bank debenture trading programs by the representations of Cohen and Weaver described above, and although they believed these  representations to be true, they asked for a face-to-face meeting with Defendant Cohen before any investment contracts were purchased from Cohen and Weaver. Plaintiff investors had Greg Hall request a face-to-face meeting with Cohen. They sought from Cohen the re-affirmation of Cohen's representations previously made, along with answers to additional questions they had for Cohen about the trading programs. In a telephone conversation with Cohen from his home in Boca Raton, Florida, Plaintiff investors, requested this meeting with Cohen.

30. In late June, 1998, Greg Hall and his wife traveled by air on a U. S. carrier to Cohen's home in Boca Raton, Florida, and met with Defendant Cohen. During this meeting, Cohen was

11

convincing as to his expertise in bank debenture trading programs.   He repeated and embellished upon his prior representations described above, and, again, described the enormous profits that he, Weaver, and their partners could earn for Plaintiff investors in medium term bank debenture trading programs as a result of his expertise and experience and that of Weaver and the other partners.   Cohen advised that he had "very powerful friends."  He told Greg Hall that he made his trading programs available only to "friends and family."  Cohen represented that he "knew this business" of trading in medium term bank debentures, that he "knew what was going on here." Cohen described his trading programs as "asset enhancement programs."  Because of the reasons stated above, Cohen's representations were false, misleading, and made in reckless disregard for the truth.

31. Cohen represented that if Plaintiff investors could invest $100 million that Cohen "could walk you into the Fed tomorrow and you will be trading within seventy-two hours making 100% a week for a forty-week program." Cohen advised that all bank debenture trading programs are forty-week trading programs.  Cohen told Greg Hall that "those who invested with him would be happy...if people left him they would always come back."  Cohen repeatedly indicated that anyone that was invited to invest in Cohen's  trading programs was "very privileged."  Cohen represented  that investing money with Cohen, Weaver and his partners was the best investment Plaintiff investors could ever make.  Cohen told Greg Hall to tell the Plaintiff investors what he had told Hall, and that Cohen was ready to begin.  For the reasons stated above, Cohen's representations, the same as made earlier, were false, misleading and made in reckless disregard for the truth.

32. Greg Hall returned to his home and told the other Plaintiff investors what Cohen had

represented to him during their face-to-face meeting. Plaintiff investors were now thoroughly convinced and, relying upon the representations of Cohen and Weaver, described above, they determined to purchase an investment contract from Cohen and Weaver to trade in medium term bank debentures. Pursuant to the directions of Cohen, Plaintiff investors, many of whom are citizens of the United States, accumulated $700,000.00 into Arcadia Resources, Ltd. to purchase the $700,000.00 investment contract from Cohen and Weaver.

33. Using the instrumentalities of interstate commerce, Plaintiff investors engaged in a plethora of telephone and wire communications with Defendant and Co-Conspirator Weaver from his home in Raleigh, North Carolina, and with Defendant and Co-Conspirator Cohen from his home in Boca Raton, Florida, pertaining to the purchase of this investment contract and to the purchase of all subsequent investment contracts. Conspiring together and with others to defraud Plaintiff investors, the material misrepresentations and omissions of material fact described above were repeated by Defendants throughout the existence of this scheme to defraud. The Plaintiff investors relied upon these representations and omissions and their repetition in making their decision to purchase this $700,000.00 investment contract and all subsequent investment contracts from Defendants, and the losses suffered by Plaintiff investors were directly caused by Plaintiff investors' purchase of Defendants' investment contracts in reliance upon these representations and omissions.

34. On July 30, 1998, Defendant Cohen sent a wire transmission from his home in Florida to Plaintiff investors containing instructions as to the way Cohen wanted Plaintiff investors' funds to be transferred to him. Cohen directed Plaintiff investors to have Arcadia Resources, Ltd. send by wire transmission the $700,000.00 to Suisse Security Bank & Trust, for credit to Sentry

13

Overseas (Bahamas), Inc., account number 212745.0602, a Cohen entity.

35. In compliance with Cohen's instructions, on July 31, 1998, Plaintiff investors had Arcadia Resources, Ltd. send by wire transmission $700,000.00 to Cohen's company, Sentry Overseas (Bahamas), Inc. to purchase the $700,000.00 investment contract.

36. As Plaintiff investors learned in November, 2000, Cohen and his Co-Conspirators were operating more than one investment scam in medium term bank debenture trading programs. Because there were several investment scams going at one time, the Defendants segregated the funds of investors into separate bank accounts to keep track of them. The funds of Plaintiffs investors were transferred into an account denominated Majestic Rose, Inc.

37. On August 16, 1998, using the instrumentalities of interstate commerce, Cohen sent a document by wire transmission from his home in Florida to Plaintiff investors stating that "everything is moving forward smoothly and we should get started [trading] in the very near future." Three days later, Cohen sent a document by wire transmission from his home in Florida complaining that he had received only $699,980.00 from Arcadia Resources, Ltd. Plaintiff investors immediately responded with a wire transmission to Cohen at his home in Florida that the $20 difference would be made up.

38. On August 19, 1998, Defendant Cohen sent a document by wire transmission from his home in Florida to Plaintiff investors stating that he "had already been approved to invest and am just waiting for us to hit the $10m mark for launch with the new friends and family program...So far up to $30m total has been pledged..." As Plaintiff investors would learn just prior to this action being filed, Cohen's statement here was false. These trading programs Cohen was pushing did not exist and Cohen could not have been "approved" to invest in them. Cohen never invested

14

any of Plaintiff investors' funds in any medium term bank debenture trading program. It was part of Defendants' scheme to defraud that Cohen and Weaver repeatedly made misrepresentations of material fact, such as these, to lull Plaintiff investors into believing everything was going extremely well with their investment contract, and to induce Plaintiff investors to purchase additional investment contracts from Defendants.

39. Defendant Cohen sent a document by wire transmission from his home in Florida to Plaintiff investors on August 25, 1998, stating that he was "getting ready to launch the new program this week...Current negotiations are taking place to let us reserve our funds at a correspondent of SSBT [Suisse Security Bank and Trust] and possibly get 2 to 1 leverage...this way our funds never effectively leave the bank..." Cohen's statements here were false since there were no bank debenture trading programs to launch, new or old. Further, there was no possibility of any 2 to 1 leverage of funds at any correspondent bank.

40. On August 28, 1998, Cohen sent a document by wire transmission from his home in Florida to Plaintiff investors stating that "(w)e will get underway next week with funds reserved at a major bank since SSBT is unrated...The future looks very bright and I am very excited. Our funds should grow weekly and we can add to them as we desire...." Cohen's statements here were false since trading in bank debenture trading programs could never get underway since they don't exist. Cohen's statement "the future look bright" was not a forward looking statement under the Reform Act of 1995 since it was a fraudulent statement Cohen knew was not warranted under the facts. Cohen's statements here were made to convince Plaintiff investors that everything was going well to induce Plaintiffs to purchase additional investment contracts being offered by Defendants.

15

41. Defendants' scheme to utilize misrepresentations and omissions of material fact to induce Plaintiffs investors to purchase additional investment contracts worked. On August 31, 1998, Plaintiff investors agreed to purchase a $100,000.00 investment contract from Defendants, as well as made up the $20.00 shortfall on the first investment contract purchased. In a telephone conference call from his home in Florida, Cohen directed Plaintiff investors to have Arcadia Resources, Ltd. send $100,020.00 by wire transmission to Defendant Sentry Overseas (Bahamas), Inc.

42. Then, on September 2, 1998, Cohen sent a document by wire transmission from his home in Florida to Plaintiff investors stating that "I will leave for London to open the account at a top British bank where our funds will be reserved...it looks like our venture will be better than dreamed." Cohen's statement here was false since Plaintiff investors' funds were not reserved. Further, Cohen's forecast had no basis in truth and was, thus, fraudulent and made in reckless disregard for the truth.

43. Cohen sent a document by wire transmission from his home in Florida to Plaintiff investors on September 4, 1998 to encourage Plaintiff investors to purchase additional investment contracts: "we are 130k short of rounding up to the next million, which would increase profits, so if anyone wants to add to their investment Friday, it is OK with me. Otherwise profits are prorated over the whole group. This is all very exciting...we are ready to roll...contracts will be signed and dispatched by Monday at the latest." Cohen's statements here are false since no profits could be anticipated from trading programs that don't exist. Cohen never signed any contracts with any bank for trading of bank debentures.

44. On September 10, 1998, Cohen sent a document by wire transmission from his home

in Florida to Plaintiff investors stating that we "should have a huge profit to get off the ground...funds sent in by tomorrow will be calculated in this situation for profit participation...will also meet with Ernst & Young...to set up there doing our accounting...was very ill...am glad to be back alive ...to...prosper with the rest of you." Cohen's statements here are false and misleading, since there were no huge profits, no accountants were ever retained, and no one prospered from these investment contracts except the Defendants.

45.  Cohen sent a document by wire transmission from his home in Florida to Plaintiff investors on September 14, 1998, stating "will start earning about 100% per week starting tomorrow with a compounding effect...Everything is looking up and all of my legal advisors seem happy." Cohen's statements are false. Cohen never earned any trading profits on Plaintiffs' investment contracts. He had no basis in truth for stating that everything was looking up.

46.  On September 16, 1998, Cohen sent a document by wire transmission to Plaintiff investors stating "will sign our contract tomorrow and start trading Monday...will be a one year contract...return should be better than mentioned...can accumulate profits and additional investment...the returns are substantial." Cohen's statements here are false. No trading ever occurred, and the returns were zero.  Cohen's statements were made to induce Plaintiff investors to purchase additional investment contracts from Defendants.

47.  Cohen's representations described above, as well as his latest, that he will "start trading Monday," and "the returns are substantial" induced Plaintiff investors to agree to purchase an additional investment contract from Defendants. On September 16, 1998, pursuant to Cohen's directions, Plaintiff investors accumulated their funds into Arcadia Resources, Ltd. and caused it to send $200,000.00 by wire transmission to Defendant Majestic Rose, Inc. to purchase an

17

additional $200,000.00 investment contract from Defendants.

48.  Then, on September 17, 1998, Cohen sent a document by wire transmission from his home in Florida to Plaintiff investors stating "will have at least ten million dollars by the middle of next week...Charlie [Weaver] and two of my attorneys are signing up for what I faxed you about yesterday [See, para. 46, supra]...Net profit on the last program should net each of you a little better than 50% per week...."  Cohen's statements here are false.  No profits were ever made.

49.  Cohen sent a document by wire transmission from his home in Florida to Plaintiff investors on September 18, 1998, stating that "program 1 will start trading at 12:30pm on Monday...in a few months, after we have at least $100 m, we will probably just trade ourselves making investment of profits a simple matter...will...keep all of you happy." Cohen's statements were false.  There was no basis in truth to make these statements. Cohen never started trading.

50.  Cohen sent a document by wire transmission to Plaintiff investors on October 7, 1998, stating that "the bank in England finally confirmed our funds to the trading bank today so we are on our way...they agreed to trade all $7,000,000.00...will have our profit start to be available to us between 11/15 and 11/20...For the next program that we can invest our profits and add money into I will set up an account in Israel..." [sic]  Cohen's statements here are false. There were no trading programs; there was no trading bank, there were no trading agreements, there were no profits that would be available between 11/15 and 11/20.

51.  In October, 1998, Cohen sent a document by wire transmission from his home in Florida to Plaintiff investors stating that "(g)ross profit [on the temporary program] should be 40% of $7,000,000.00...Those of you that did not make it in on time will participate next month. We should be doing actual trading and actually make a lot of money...in an emergency call Charlie

[Weaver]." Weaver discussed Cohen's representations with Plaintiff investors during a conference telephone call from Weaver's home in North Carolina and Weaver told Plaintiff investors that Cohen's representations were correct. However, Cohen's statements and, thus, Weaver's were false. There were no trading programs and no profits from trading programs.

52. Cohen had his wife, Gail, send by wire transmission from their home in Florida to Plaintiff investors, on October 20, 1998, a document hand-written by Cohen stating "(w)e are there in better shape than hoped for...first profits will be compounded this Friday...will be able to add and compound...our future is solid...please keep knowledge about our program off the street...do not want to risk losing the opportunity of a lifetime. Fight the temptation to become richer-you will be rich enough." Cohen's statements here are false. There were no bank trading programs in which Cohen was involved; there were no profits to compound and his forecasts had no basis in truth and were false, misleading, and made in reckless disregard for the truth.

53. In November, 1998, Cohen sent a document by wire transmission from his home in Florida to Plaintiff investors stating: "(o)ur man handling the operation was in Raleigh working on the new program with Charlie [Weaver] and Mike but flew back tonight...he confirmed that we got 40% gross on our $7,000,000.00...I have been trying to get hundreds of millions in investment finished so that we can all enjoy its benefits in the new situation." Weaver discussed Cohen's representations with Plaintiff investors in a conference telephone call from his home in North Carolina and told Plaintiff investors that Cohen's representations were true. However, Cohen's statements and, thus, Weaver's were false. There was no profit of 40% of $7,000,000.00. There were no hundreds of millions in investment Cohen was trying to finish. Cohen's statements here were made to induce Plaintiff investors to purchase additional investment

19

contracts from Defendants.

54. Again, Defendants' efforts to induce Plaintiff investors to purchase additional investment contracts were successful. In November, 1998, relying upon Defendants' representations as to the success and profitability of these bank debenture trading programs described above, Plaintiff investors sent a document by wire transmission to Cohen at his home in Florida agreeing to purchase a $ 1 million investment contract from Defendants. On November 18, 1998, Cohen sent a document by wire transmission from his home in Florida to Plaintiff investors instructing them to have Arcadia Resources, Ltd. send the $ 1 million by wire transmission to "my attorney's trust account." This attorney was Stuart B. Kalb of Plano, Texas. Cohen represented to Plaintiff investors that Kalb was a "new partner." On November 19, 1998, Cohen sent Kalb's "Vita" by wire transmission from Texas to Plaintiff investors.

55. On November 30, 1998, relying upon the representations described above as to the success and profitability of these bank debenture trading programs Plaintiff investors were allegedly enjoying, and pursuant to Cohen's directions, Plaintiff investors accumulated their funds into Arcadia Resources, Ltd. and had it send $1,000,000.00 by wire transmission to Stuart B. Kalb, Attorney at Law, Iolta Trust account no. 88469-02359, Bank of America, Texas, to purchase an additional $1,000,000.00 investment contract from Defendants.

56. Cohen sent a document by wire transmission from his home in Florida to Plaintiff investors on December 16, 1998, entitled "Monthly Earnings Report for Arcadia Resources, Ltd." The document represented that through the month of November, 1998, the "Total Gross Profit" from Plaintiff investors' purchase of investment contracts from Defendants was $2,800,000.00. The document stated that for this same period the "Client Net Profit" was $142,560.00 These

representations of Defendants contained in this document were false, since no profits had been earned from any investments.

57.  Cohen sent a document by wire transmission from his home in Florida to Plaintiff investors the following day stating, "if you need someone in an emergency...call Charles Weaver at 919-847-8768. The wires will go out as soon as the funds are confirmed into our account...we are getting ready for the funds to start making more money next week.  It will be a very good year."  Cohen's statements here are false. Defendants never made any profits trading bank debentures, thus, they could not "start making more money next week." There was no basis in truth for the profit forecast that it will be a very good year.

58.  The next day, Cohen sent a document by wire transmission from is home in Florida to Plaintiff investors stating that "(c)onfirmation of the payment should be in Charlie's [Weaver] hands by Tuesday."  Cohen's statement here was false.  No profits were ever earned by Defendants from trading, thus, no confirmation of the payment of profits could be forthcoming.

59.  On December 28, 1998 Cohen sent a document by wire transmission from his home in Florida to Plaintiff investors.  Cohen stated that he had just returned from a cruise and that "(k)nowing that Charlie [Weaver] and Stuart [Kalb] could handle things in my absence allowed me to finally relax...After the 6th I will be back full time once again.  Until then Charlie [Weaver] is the man to speak with...Stuart [Kalb] was in London until Christmas eve sorting out things there...Charlie [Weaver] said that the investor's banks were not co-operative on the larger amounts so we had to arrange new friendlier bankers...we could not get our own trading kicked off before the end of the year but expect to start on the 11th of January. The person who will be selling us our paper asked if we would leave the funds in the temporary program until 1-6-98

21

which gives us at least two weeks of additional income...only those participating currently should earn December profits...disbursements will not go out until after the 6th of January.  That was a tradeoff for the extra income and it was already so late that Stuart [Kalb] and Charlie [Weaver] thought that it was the best thing to do and as a partner out of touch it was their call; which I agree with.  We had expected that the profits were wired to us but they had the right to delay because of slow action of our bank and attorney in London...Happy New Year...I know that it will be a profitable one and all of you will share in the rewards." Weaver discussed Cohen's representations with Plaintiff investors in a telephone conference call from his home in North Carolina and told Plaintiff investors that Cohen's representations were correct.  However, Cohen's representations and, thus, Weaver's were false and misleading.  Defendants never began trading bank debentures.  There was no income being earned on trading because there was no trading.  There was, of course, no real expectation of profits, since there was no trading.  There was no basis in truth for the representations as to a "profitable" new year in which "you will share in the rewards."

     60.  On January 6, 1999, Cohn sent a wire transmission from his home in Florida to Plaintiff investors in which Cohen described how he had made certain arrangements with First Union Bank to start "the new program" where Defendants "will be allowed only to reserve the [Plaintiffs'] funds, not remove them."  Cohen reported that this would be a "full 40-week program with profits of 1% per day."  Cohen represented "(t)his is a serious situation that will allow all investors to benefit by being part of much larger transactions...Earnings should be substantial." Cohen reiterated to Plaintiffs that "only a select few got a chance for an investment like this...payout would be so large they would have to select a charity."  Cohen's statements here

were false.  No banking arrangement was ever made by Cohen with First Union Bank for trading. All these representations describing the substantial profits Defendants were and would be making for the Plaintiff investors were made for the purpose of inducing Plaintiff investors to purchase additional investment contracts from Defendants.

61.  In a wire transmission to Plaintiff investors sent by Cohen from his home in Florida on the same date, Cohen reported that "(t)he temporary program ends today and those that placed funds...will start to earn profits.  Those that earned funds at the end of November just earned some more."  Cohen's statements were false.  No profits were earned. There were no temporary programs.

62.  Also on the same date, from his home in Florida, Cohen sent a wire transmission to Plaintiff investors instructing Plaintiffs to "call when you have the money to send and how much and I will decide which account to send it to.  I am looking to about a billion dollars to process in the next month...."  Again, Cohen is soliciting the purchase of additional investment contracts by Plaintiff investors.  Cohen's statement here is false since he never had any possibility of having  "a billion dollars to process."

63.  In a wire transmission to Plaintiff investors on January 8, 1999 from his home in Florida, Cohen reported that "First Union Bank has agreed to give our larger clients their own sub-account where they will be the only party able to remove funds from the bank...as our relationship with the bank is solidified we will...trade AA or better paper at the bank...will start earning our January profits...(a)nother banking situation that we will also be a part of will be set up at a major bank in Paris and Charlie [Weaver} will leave for that local [sic] as soon as it is set up and ready to receive funds."  Weaver discussed these representations with Plaintiff investors

23

during a telephone conference call from his home in North Carolina and told Plaintiff investors that Cohen's representations were true.  However, Cohen's statements and, thus, Weaver's describing agreements with First Union Bank are false.  First Union Bank never made any such agreements.  Defendants never traded AA or better paper at First Union Bank, and had no expectation of doing so.

64.  In an effort to induce Plaintiffs to purchase additional investment contracts from Defendants, on January 12, 1999, from his home in Florida Cohen sent a document by wire transmission to Plaintiff investors outlining various investor options available to them.  The document was entitled "Current Options."  Cohen stated that the document was "for explanation purposes in case you want to increase your investment...."

65.  In a wire transmission to Plaintiff investors from Cohen at his home in Florida on January 15, 1999, Cohen advised that "we have received written confirmation that we will be paid our profits on the 28th of this month...By next Wed. our new account will finally be opened at First Union Bank and we can start setting up sub-accounts.  This is allowing us to bring in a great deal of funds which greatly increases our returns...The profits will be traded...The future looks very bright."  Cohen's representations here are false.  There were no profits and no written confirmation of being paid profits.  Plaintiff investors were never paid any profits.  These misrepresentations by Cohen, as well as those described above, were made by Defendants to induce Plaintiff investors to purchase additional investment contracts from Defendants.

66.  On January 22, 1999, relying upon the representations of Defendants described above, Plaintiff investors agreed to purchase an additional investment contract from Defendants.  At the direction of Cohen, Plaintiff investors accumulated their funds into Arcadia Resources,

Ltd. and had it wire $1,000,000.00 to Defendant Summerfield International Services, Inc.,

account no. 88465-05746, at the Bank of America, Texas, to purchase an additional $

1,000,000.00 investment contract from Defendants.

67.  Although Plaintiff investors had been convinced by Defendants that their "profits"

should be reinvested, at this time, Defendants directed that a "Ponzi" payment of so-called

"profits" of $25,000.00 be paid to Plaintiff investors through the transfer of $25,000.00 from

Majestic Rose, Inc. to Arcadia Resources, Ltd.

68.  Relying upon the representations of Defendants as to how well their investments were

doing and as to the profits that were being earned, on February 2, 1999, Plaintiff investors agreed

to purchase an additional investment contract from Defendants.  At the direction of Cohen,

Plaintiffs investors accumulated their funds into Arcadia Resources, Ltd. and sent $250,000.00 by

wire transmission to Defendant Summerfield International Services, Inc., account no.

4025007505, First Union National Bank, Charlotte, North Carolina to purchase an additional

$250,000.00 investment contract from Defendants.

69.  On the same date, Cohen sent a document by wire transmission from his home in

Florida to Plaintiff investors stating that "(o)ur new setup at First Union is working like a

dream...the new setup has the bank guaranteeing the safety of funds...I expect there to be over

$100m within another week...I have had several offers to go directly into and sign contracts with

important banks.  We will now have enough money to do this.  The profits will be earned quickly

and will be very substantial.  These representations were false.  No relationship was established

with First Union Bank that contained these provisions.  There were no profits earned from

trading.

70. Cohen sent a document by wire transmission from his home in Florida to Plaintiff investors relating his travel plans necessary to administer the trading programs:: "flying to London to start the new program...will fly back...leave for Atlanta...leave for Paris...on to London to involve additional funds that will become available at that time. Charlie [Weaver] will be available to all while I am gone...I am very excited about what is happening for us in every corner...Charlie [Weaver] and Stuart [Kalb] will coordinate new contracts and banking while I am gone." Cohen's statements about his travels were true. The inference that his travels were in connection with successfully trading bank debentures is false. The statement as to Cohen's excitement over his trading accomplishments had no basis in truth. Cohen's partners, Charlie and Stuart, were not coordinating new trading contracts and banking in Cohen's absence or at any time.

71. On February 3, 1999, Cohen sent by wire transmission from his home in Florida to Plaintiff investors a document entitled "Monthly Earnings Report for Arcadia Resources, Ltd." The document represented that in the month of December, 1998, the "Total Gross Profit" from was $1,400,000.00. The document represented that for this same period the "Client Net Profit" was $71,280.00. Cohen's representations contained in this document were false. Defendants had earned no profits from trading the funds of Plaintiff investors. Cohen's representations were made by Defendants to induce Plaintiff investors to purchase additional investment contracts from Defendants.

72. Relying upon these representations, Plaintiff investors agreed to purchase an additional investment contract from Defendants. Pursuant to Cohen's directions, Plaintiff investors accumulated their funds into Arcadia Resources, Ltd. and sent $200,000.00 by wire

26

transmission, on March 4, 1999, to Creai-Cohen, a Joint Venture, account no. 2622121474-44

CLE23, to C.I.C. Paris, France, for transfer to Creai Action Service to purchase an additional

$200,000.00 investment contract from Defendants. In a conference telephone call from his home

in North Carolina, Weaver told Plaintiff investors that they would make more money than they

had made previously if they purchased these additional investment contracts since Creai Action

Service was going to put in $100,000,000.00, which would permit Creai Action Service to engage

in larger, and more profitable trading programs from which Plaintiff investors would profit.

73.   Cohen and Weaver were "Special Financial Managers" of Creai Action Service.

They were also joint signatories with Jean-Pierre Martinez, the President of Creai Action Service,

on Creai Action Service's bank account at CIC Paris. [See, Exhibit A to Complaint.]

74. Again, on March 5, 1999, relying upon Defendants' representations about Creai

Action Service described above, Plaintiff investors agreed to purchase an additional investment

contract from Defendants. Pursuant to Cohen's instructions, Plaintiff investors accumulated their

funds into Arcadia Resources, Ltd. and sent $250,000.00 by wire transmission to Creai-Cohen, a

Joint Venture, account no. 2622121474-44 CLE23, to C.I.C. Paris, France, for transfer to Creai

Action Service to purchase an additional $250,000.00 investment contract from Defendants.

75.   At about this time, Cohen sent a document by wire transmission from his home in

Florida to Plaintiff investors stating "we have a contract-escrow agreement for review with IBJ-

Whitehall which is part of the Industrial Bank of Japan...number 8 in the world...I will...start

trading next week..."Cohen's statement was false. There was no basis in truth for his statement

that he would start trading next week. Cohen never traded and neither did Weaver.

76. As the entity that Defendants represented was "the trading vehicle" for the trading of

medium term bank debentures to earn enormous profits using the funds of Plaintiff investors and

other investors,  $ 9,000,000.00 was transferred into the Creai Action Service account at CIC

Paris from the Creai-Cohen account at CIC Paris.  Cohen was named Treasurer of Creai Action

Service. Included in this $ 9,000,000.00, was $3,700,000.00 of funds belonging to Plaintiff

investors. [See, Exhibits B, C and D to Complaint.] Defendants representations here were false.

There would be no trading in medium term bank debenture trading programs.  These programs do

not exist.

    77.  Creai Action Service determined that all of the profits from the funds on deposit in

CIC Paris, including the funds of Plaintiff investors, were to be paid monthly to Paul Morato, a

protege of the President of Creai Action Service, Jean-Pierre Martinez. [See, Exhibit A to

Complaint.]  Creai Action Service named Morato as Deputy Financial Manger of Creai Action

Service with the authority to open up bank accounts of Creai Action Service in foreign countries

with Cohen..

    78.  Cohen sent a document by wire transmission from his home in Florida to Plaintiff

investors on March 13, 1999, representing that IBJ-Whitehall was "drawing up a contract for us

that will guarantee to our investor-depositors that their funds are completely safe...We are

being...treated very well because we were recommended to the bank by one of their attorneys that

has represented Charlie [Weaver] for over ten years...Sunday I will go to France to sign all papers

there so that I can get those funds among others into trading next week...Immediate profits will be

generated and a disbursement made to those of you desirous of such...Then we will compound

and keep trading..."  Cohen's statements here were false.   No profits were being made by

Defendants in trading.  Defendants were not trading in bank debentures.

79.  To dissuade Plaintiff investors from requesting a distribution of profits Defendants represented that they had made from trading, Cohen continually made representations as to the additional profits Plaintiff investors were earning by allowing their profits "to compound" instead of withdrawing their profits. Cohen's representations here were false.  There were no profits from trading in bank debenture trading programs. Thus, there was no compounding.  Cohen's representations were made to encourage Plaintiff investors not to ask for the return of any of their funds.  Defendants continually sought to have Plaintiff investors purchase additional investment contracts from Defendants.

80.  Cohen and Weaver were also "Special Director Representatives (hereinafter referred to as 'Special Director')" of Creai Action Service "to take all the necessary steps for the purpose of conducting General Investment Transactions." Cohen and Weaver were made "signatories for the Corporation on all matters in connection with such Investment Opportunities...and that this authority shall continue as long as the Corporation is engaged in Investment Opportunities with Summerfield." [See, Exhibit E to Complaint.]

81.  In a document sent by wire transmission on March 19, 1999, from his home in Florida,  Cohen represented to Plaintiff investors that "(t)hings thus far have gone fanatically." Cohen informed Plaintiff investors that their funds were at "CIC in Paris"  Cohen reported that "trading of these funds along with all others...in place by Tuesday morning will take place by mid-week. There should be at least three hundred million involved next week.  Cohen instructed Plaintiff investors "to place important calls" to Charlie Weaver, and, again, listed Weaver's telephone and fax numbers.  Cohen reported that Weaver "might be with me part of the time but someone will forward them."  In a telephone conference call with Weaver from his home in

29

Raleigh, North Carolina, Weaver told Plaintiff investors that Cohen's representations were correct. However, Cohen's statements and, thus, Weaver's were false. Cohen was not doing any trading, he never was involved with three hundred million dollars, and things had not gone fantastically as far as the investment of Plaintiff investors' funds.

82. In this document Cohen also represented that "(o)ver a million dollars has been set aside in the Majestic Rose account for profit disbursement to those wanting some funds at the end of the month but I anticipate that most investors will want to compound their earnings." Here, Cohen's representations were made to entice Plaintiff investors not to request a return of any of their funds. Of course, there were no profits and if requested, Defendants would have had to return Plaintiff investors' principal, calling it profits as Defendants had done previously. Cohen, again, conveyed to Plaintiff investors their "privileged status" in having the "opportunity" to purchase these investment contracts by telling Plaintiff investors "(p)lease do not solicit any friends or associates to join you in your relationship with us."

83. On March 22, 1999, Cohen, as Financial Manager of Creai Action Service, gave Jean-Pierre Martinez, President of Creai Action Service, "full power of attorney...to allow him under his own signature to transfer Creai Action Service funds deposited on CIC PARIS account to the bank(s) of his choice..." [See, Exhibit F to Complaint.]

84. The next day, Martinez moved all of Plaintiff investors' funds, as well as the funds of other investors, from CIC Paris to Banque Worms, Paris.

85. Thus, on March 23, 1999, there was $12,000,000.00 in funds on deposit at Banque Worms, Paris, including $3,700,000.00 in funds belonging to Plaintiff investors. [See, Exhibit G to Complaint.] Banque Worms listed Martinez as President of Creai Action Service and Cohen as

Finance Director.

86. By April 1, 1999, there was $15,000,000.00 on deposit in the name of Creai Action Service in Banque Worms, Paris, including $3,700,000.00 in funds belonging to Plaintiff investors. [See, Exhibit H of Complaint.]

87. On April 4, 1999, from his home in Florida, Cohen sent a document by wire transmission to Plaintiff investors telling them that (e)verything is going well...had a problem with CIC bank...so had to transfer all of the funds to Banque Worms and start process over...we will start trading after I fly back on Tuesday...our funds and myself have been cleared for trading." Cohen's statements are false. There was no trading. Cohen had not been cleared for trading. Cohen conveyance of a feeling of well being from trading had no basis in truth.

88. Cohen sent a document by wire transmission from his home in Florida to Plaintiff investors on April 22, 1999, representing that he "will also see the trader here in Florida that we did our $2.5B deal with that is now complete...(f)unds, banks and myself are approved...(t)hings are in great position." There was no $2.5 billion "deal...now complete." Cohen's representations as to his abilities to handle a transaction of this magnitude was made to assuage Plaintiff investors that Defendants knew how to trade Plaintiff investors funds.

89. On May 7, 1999, Cohen represented to Plaintiff investors in a document sent by wire transmission from Cohen's home in Florida that "trading will start within 72 hours." Cohen reported that Plaintiff investors would have " a return...of about 400%...principal must stay in the bank for a year...profits may be reinvested if you so choose." Cohen's statements are false. There was no basis in truth to represent that trading would start in seventy-two hours, nor was there any basis in truth for the representation that Plaintiff investors would have a return on their

31

investment contracts of "about 400%." Cohen's statement that the "profits may be reinvested" was false, and only a ploy to entice Plaintiff investors to not request a return of "their profits."

90. From his home in Florida  Cohen sent to Plaintiff investors a document by wire transmission on May 23, 1999, stating that IBJ Whitehall has finally approved everything and we can now move forward....Joe Krota will be in charge of all of the due diligence...investors...will deal with Joe [Krota]...once everyone's funds are in then we will close the program...(i)f I am not here, call Charlie [Weaver]...(t)his should be the start of great things for all concerned." Cohen established no bank trading relationship with IBJ Whitehall.  There was no basis in truth for Cohen's representation "this should be the start of great things."

91. In late May, 1999, a second "Ponzi" payment of so-called profits in the amount of $50,000 was made to Plaintiff investors by Defendants.

92. On June 12, 1999, Michael Sweet, the intermediary for Martinez and Morato,  sent a fax transmission to Cohen at his home in Florida and to Weaver at his home in North Carolina warning them that "no faxes are to be sent direct to Paul [Morato] in France in English.  All communication is to London for translation and advice as Paul does not speak English and he worries that misinterpretation may occur if other parties view the fax.  It is a very sensitive and volatile situation and we have had to work hard today to keep the lid on...the French are very focused on only their position." [See, Attachment I to Complaint.]

93. Cohen represented to Plaintiff investors in a fax transmission from his home in Florida on June 13, 1999,  that "(t)he current plan is a bank closing in New York on Tuesday and then on to London for another one Wed-Thurs...in case of emergency call Charlie [Weaver].  Cohen's representation as to bank closings in New York and London were false.  There were no bank

closings in New York or London to be made in connection with trading.

94. In a document sent by fax transmission from his home in Florida to Plaintiff investors on June 28, 1999, Cohen represented that "everything is great. Normal trading could start as early as next week and the IBJ sub accounts are being processed for opening by Joe Krota." Other than Cohen's statement indicating Joe Krota's involvement, these statements are false. There was no basis in truth for this representation that normal trading could start next week or that everything was great.

95. On June 30, 1999, Cohen sent a document by wire transmission from his home in Florida to Plaintiff investors stating that he "will fly to London to finish at the bank Monday and Tuesday...Charley [Weaver] might be home or he might be with me. Joe Krota will be available for processing future investment information..." Cohen's representation was false and misleading. Cohen had no business to finish at the bank in London that pertained to trading of Plaintiff investors funds.

96. On July 2, 1999, Cohen informed Plaintiff investors by wire transmission from his home in Florida that he would be in London "for the next ten days"...if you need me call Charlie [Weaver]..." Cohen's suggestion that he had to be in London for the next ten days to conduct trading of the Plaintiff investors' funds was false.

97. The next day, Cohen again sent a wire transmission to Plaintiff investors "asking everyone to please call Charlie [Weaver] at 919-847-8768 instead of my home...will send out a fax as soon as things finish." Cohen was not in London conducting trading of Plaintiff investors' funds.

98. On July 13, 1999, Cohen sent a document by wire transmission from his home in

Florida to Plaintiff investors stating that "(t)hings have been going very well..hope to finish at the Bank tomorrow...the return should make everybody happy and once profits are placed in the IBJ program, everyone should be ecstatic...am working my ass off for the benefit of all concerned and appreciate your patience and support." These statements are false. There was no business at the bank involving the trading of Plaintiff investors funds and there was no IBJ trading program. There was no basis in truth for the statement that "everyone should be ecstatic."

99. Cohen sent a document by wire transmission from his home in Florida to Plaintiff investors on July 21, 1999, stating that "(t)hings have been going extremely well...I will be able to share all the good news with you. Charlie [Weaver] is still not back and must go to Switzerland before coming home...the long wait was well worth it and the future is guaranteed to be exciting and prosperous...Charlie [Weaver] and I did not expect to be away so long and the...meeting schedule has made communication by phone difficult. Thanks for hanging in there." Of course, Cohen's statements about things going well, there is good news to share, the future is guaranteed to be prosperous had no basis in truth.

100. On July 27, 1999, from his home in Florida Cohen sent a wire transmission to Plaintiff investors stating that "(e)verything has gone beyond expectation and come together perfectly...Charlie [Weaver], who got back Sunday, will be in Washington tomorrow and the next day." During this time, in a telephone conversation with Plaintiff investors from his home in North Carolina Weaver discussed these representations with Plaintiff investors and said that Cohen's representations were true. However, Cohen's representations and, thus, Weaver's were false and misleading. The "beyond expectation" representation had no basis in truth as far as any actual profits from trading using the funds of Plaintiff investors. Cohen's description of Weaver's

34

activities was false and misleading, as if Weaver was actively attending to trading on behalf of Plaintiff investors..

101.   From his home in Florida Cohen sent a wire transmission to Plaintiff investors on August 3, 1999, in which he represented that "(w)e are definitely in a program and returns will be received this month, but substantial returns will start in September...everybody should be happy...Charlie [Weaver] will be in Washington and New York until Saturday and then he will go set up our bank accounts where profits can go next Tuesday in Europe." Weaver discussed these representations with Plaintiff investors during a telephone conference call from his home in North Carolina and told Plaintiff investors that Cohen's representations were accurate. However, Cohen's representations and, thus, Weaver's were false and misleading. Representations that we are in a program, as well as descriptions about the returns and the activities of Weaver were false and misleading. There was no trading and no profits being earned from trading by Defendants to be placed in a bank.

102.   On August 26, 1999, Plaintiff investors sent a wire transmission to Charlie Weaver in Raleigh, North Carolina, and to Mark Cohen in Boca Raton, Florida, asking each of them to confirm the representations Plaintiff investors had just received by wire transmission from Joe Krota in New Mexico. Krota represented to Plaintiff investors that: "1. Pre-contracts were signed yesterday (August 25). 2. Final contracts signed today (August 26). 3. The revised trading to commence on August 30th. 4. Gross returns of one hundred percent (100%) of principal weekly for forty (40) weeks. 5. Net returns of fifty percent (50%) of principal weekly for forty (40) weeks to my group. 6. First disbursement to be received to be wired to our account on Monday September 6, 1999." These representations were false. There was no basis

35

in truth for such representations.

103.  On November 12, 2000, Weaver admitted to Plaintiff investors that he read this fax

transmission but did not contact Plaintiff investors and inform them that none of Krota's

representations were true.  In fact, Krota's representations were false.  No contracts for trading

were signed.  No trading was ever done.  No contracts provided for returns of one hundred

percent, nor fifty percent.  No returns were ever paid.

104. Cohen sent a wire transmission from his home in Florida to Plaintiff investors on

August 27, 1999, representing that "Charlie [Weaver] and Joe [Krota] said that they have been in

contact with most everyone [of the investors]."  Cohen told Plaintiff investors in this wire

transmission that "[w]e now have a great deal of funds and have started our ultimate goal of daily

trading."  Cohen told Plaintiff investors that Plaintiff investors' funds "are still with

CREAI...[that] CREAI decided that rather than receive a lower return, they would increase their

participation to over $100,000,000.00."  Cohen represented that "(t)heir funds are now assembled

and Charlie [Weaver] will get the accounts and new agreements in place this coming week in

Europe."  To forestall Plaintiff investors' requests for a profit distribution, Cohen represented to

them that "(w)e have been advised that you must stay a part of CREAI, but that we can advance

profits to you against profits to be earned from our own profit share from other deals."  Cohen

suggested to Plaintiff investors that if they wished to purchase additional investment contracts

they should contact Joe Krota "to see if you qualify and desire to participate in what is available."

These representations were false.  Cohen representations that we have started "daily trading", that

Creai would put up $100,000,000.00 to be combined with Plaintiff investors' funds for daily

trading, that Plaintiff investors had to "stay a part of CREAI", and that Cohen and Weaver had

earned profits "from other deals" were all false,  misleading, and made in reckless disregard for the truth.  There was no basis in truth for these representations.  These representations were made by Defendants to assure Plaintiff investors that Defendants were successfully investing their funds in trading.

105.  To further assuage Plaintiff investors, Defendants represented to Plaintiff investors that they had  negotiated a clause an the agreement they made with Creai Action Service that if Creai Action Servie did not put in $100,000,00.00 for daily trading, it would pay a penalty to Plaintiff investors of $2,000,000.00.  Creai Action Service never put in $100,000,000.00 for daily trading, and it never paid a $2,000,000.00 penalty to Plaintiff investors for failing to do so.

106.  Cohn sent a wire transmission to Plaintiff investors on August 30, 1999, summarizing the current status by representing "(e)verybody will be happy as you will end up with much more profit plus the early return of your funds..."  These representations were false. There were no profits, no early return of Plaintiff investors's funds, and Plaintiff investors would  not be happy.

107.  On November 26, 1999, Cohen sent a wire transmission from his home in Florida to Plaintiff investors stating that "Joe [Krota] and Charlie [Weaver] are doing a wonderful job..." This representation was false.  Krota and Weaver were doing nothing that could be considered "a wonderful job" in connection with the investment contracts purchased by Plaintiff investors.

108.  On June 6, 2000,  Krota reported to Plaintiff investors that Weaver represented that "we're days away" from paying Plaintiff investors their funds.  This representation was false. Plaintiff investors have not been paid.

109.  As detailed above, Defendants continually reassured Plaintiff investors that their

funds were secure and that their funds were involved is medium term bank debenture trading programs. Plaintiff investors were promised and reassured that their funds used to purchase these investment contracts would be repaid to them along with the profits earned thereon.  Plaintiff investors have not received satisfactory answers to their inquires other than a repeat of these representation and promises.

110.  On November 14, 2000, in a meeting with Weaver, he informed Plaintiff investors that he had received all of Cohen's fax transmissions discussed above that Cohen had sent to Plaintiff investors.

111.  On this same date, Weaver told Plaintiff investors that Weaver and Cohen had previously  raised money $ 17 million from investors in an investment scam with Larkin Pahl, an attorney from North Carolina.  Weaver stated that Pahl had plead guilty to federal offenses and the Grand Jury investigation was continuing. Weaver stated that he had been  interested in using the funds derived from the use of Plaintiff investors funds to re-pay some of the investors in the "Larkin Paul" scam.  Weaver stated that he was going to be indicted in connection with the Larkin Paul scam.

112.  On December 20, 2000, in a meeting with Cohen, he informed Plaintiff investors that he had sent copies of every one of his fax transmissions discussed above to all Plaintiff investors, and to Weaver, Martinez, Morato, Sweet and Krota, as well as to other investor not parties to this action.

113.  On March 21, 2000, Defendants represented to Plaintiff investors that their $3,700,000.00 had been "forfeited" to Creai Action Service.

114.  As of the date of the filing of this Complaint, other than the $75,000.00 in "Ponzi"

payments of so-called profits to Plaintiff investors described above, Plaintiff investors have not

been paid any of the profits Defendants reported had been earned with Plaintiff investors' funds.

115.  As of the date of the filing of this Complaint, and despite demand, Plaintiff investors

have not been repaid any of their $3,700,000.00 which represents the total purchase prices paid

for the eight investment contracts Plaintiff investors purchased from Defendants.

**COUNT I**
**VIOLATION OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT OF 1934**
**AND RULE 10b-5**
**AGAINST ALL DEFENDANTS**

116.  Plaintiff investors incorporate by reference and reallege paragraphs 1 through 115

above as if set forth herein.

117.  This claim is asserted by Plaintiff investors against all defendants and is based upon

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. sec. 78j(b) and Rule 10b-5

promulgated thereunder.

118.  During the period described, the defendants, individually and in concert, directly and

indirectly, through the instrumentalities of interstate commerce, to wit: wire transmissions,

telephone communications and the mails, knowingly engaged and participated together in a

continuous course of conduct to actively deceive Plaintiff investors and to conceal adverse

material information from Plaintiff investors as described herein that included the following:

Defendants knowingly and recklessly employed devices, schemes, and artifices to defraud and engaged in acts, practices, and a course of conduct which operated as a fraud and deceit upon Plaintiff investors and made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.  Using the above means, Defendants offered and sold to Plaintiff investors these investment contracts.  Defendants used these same means to lull Plaintiff investors into believing up to the time this Complaint was filed that these investment contracts were legitimate and the profits promised from these investment contracts would be forthcoming.

119. Acting with intent to deceive and with reckless disregard for the truth, Defendants used devices, omissions, misrepresentations, acts, and practices to deceive Plaintiff investors into purchasing these investment contracts and into believing in their legitimacy and certainty of full payment, as described herein.

120.  Plaintiff investors relied upon the course of conduct of defendants described above in making their decision to purchase the investment contracts offered by defendants.

121.  Had Plaintiff investors known of the materially adverse information that was not disclosed by defendants, and had Plaintiff investors not been deceived by defendants' devices, misrepresentations of material facts, acts and practices, Plaintiff investors  would not have purchased these investment contracts offered by defendants, and would not have sustained damages resulting from their purchase.

## COUNT II
## VIOLATION OF SECTION 29(b) OF THE SECURITIES EXCHANGE ACT OF 1934
## AGAINST ALL DEFENDANTS

40

122. Plaintiff investors incorporate by reference and reallege paragraphs 1 through 115 above as if set forth herein.

123. Defendants violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

124. As a result, Plaintiff investors are entitled to the recission of their investment contracts and return of their funds pursuant to Section 29(b) of the Securities Exchange Act of 1934, 15 U.S.C. s 78cc (b). All the investment contracts entered into by Plaintiff investors with Defendants are void pursuant to Section 29(b). Further, all contracts and agreements by and between Defendants and their representatives 1) dealing with the funds of Plaintiff investors, or 2) transferring the funds of Plaintiff investors, or 3) depositing the funds of Plaintiff investors in any financial institution , or 4) holding the funds of Plaintiff investors are void.

125. Pursuant to Section 29(b), Plaintiff investors funds totaling $3,700,000.00 must be returned to Plaintiff investors, along with all interest and profits earned thereon, by any person or entity or combination thereof having possession and/or control of those funds. Pursuant to Section 29(b), Plaintiff investors are entitled to recission of all contracts made using their funds and  Defendants, their agents, associates and parties with whom they have contracted are required to return those funds to Plaintiff investors.

## COUNT III
## VIOLATION OF FLORIDA STATUTE s 517 ET SEQ.
## AGAINST ALL DEFENDANTS

126. Plaintiff investors incorporate by reference and reallege paragraphs 1 through 115 above as if set forth herein.

127. In connection with the rendering of investment advice and with the solicitation of the Plaintiff investors to supply substantial sums for investments in bank debentures and the millions of dollars procured by Defendants from Plaintiff investors for those purported "investments", Defendants, by virtue of and in the manner of the conduct described above, directly and indirectly: (a) employed devices, schemes, and artifices which worked to defraud Plaintiff investors of their money; (b) obtained money by means of untrue statements and omissions of material fact necessary to make the statements made not misleading; (c) engaged in practices and courses of business dealings which operated as a fraud and deceit upon Plaintiff investors; and/or (d) knowingly and willfully falsified, concealed, and/or covered up by trick, scheme, and device, material facts, made false, fictitious, and fraudulent statements and representations, both written and oral, and further used false writings and documents, knowing them to contain false, fictitious, and fraudulent statements.

128. Specifically, during the course of controlling Plaintiff investors' substantial funds, Defendants failed to invest them in the manner in which they represented the monies would continue to be and had been invested.

129. Further, over the course of the fraudulent scheme, Defendants continued to make misrepresentations of material fact and failed to state facts materially necessary to rectify the

42

misleading character of other statements as to the existence of the purported "investments," the nature of those investments, and the profitability of those investments, and thereby, during the course of the scam, were able to convince Plaintiff investors to depart with even greater sums of money on the multiple separate occasions described in the Complaint.

130. Plaintiff investors justifiably relied upon the misrepresentations and omissions made by Defendants and were induced to part with substantial sums, comprising millions of dollars, over the course of the fraudulent scheme based upon those misrepresentations and omissions of material fact.

131. The course of conduct engaged in by Defendants directly and proximately caused Plaintiff investors to suffer substantial injury, including, but not limited to, the loss of Plaintiff investors' principal and the loss of a reasonable rate of return on their investments.

132. Plaintiff investors are entitled to recover all damages permitted under Florida Statute s 517.211 by law in addition to attorneys' fees, costs, interest, and all other relief deemed just and proper.

**COUNT IV**
**BREACH OF FIDUCIARY DUTY**
**AGAINST ALL DEFENDANTS**

133. Plaintiff investors incorporate by reference and reallege paragraphs 1 through 115 above as if set forth herein.

134. In connection with Plaintiff investors' entrustment of their substantial sums of money with Defendants, in reliance upon the numerous representations to Plaintiff investors described above regarding the investments which would be procured on their behalf and the return on those

43

investments which Plaintiff investors could expect to receive, Defendants owed Plaintiff investors the highest fiduciary duty of good faith, loyalty, care, and fair dealing. This fiduciary relationship, and the confidence and trust reposed within it, caused Plaintiff investors to rely upon the Defendants' advice and recommendations, as well as on their ability to professionally handle and manage Plaintiff investors' monetary assets in a manner consistent with that which was represented by Defendants and consistent with Plaintiff investors' investment objectives and needs.

135.   Defendants accepted this trust and confidence and assumed the duty to, at all times material, act with the highest degree of loyalty and care in handling Plaintiff investors' investments. Notwithstanding their assumption of this duty of good faith, loyalty, and fair dealing, Defendants intentionally and willfully failed to invest Plaintiff investors' funds in accordance with the representations advanced in the solicitation of millions of dollars from them and intentionally and willfully violated the corresponding fiduciary duty attending Plaintiff investors' entrustment of those substantial funds with Defendants.

136.   As a result of the foregoing description of the events that caused Plaintiff investors to part with millions of dollars, Defendants not only violated their common law fiduciary obligations to Plaintiff investors, but also, the law.

137.   Plaintiff investors are entitled to recover compensatory, consequential, and all other damages permitted by law, in addition to costs, interest, and all other relief deemed just and proper.

## COUNT V
## CIVIL REMEDIES FOR CRIMINAL PRACTICES
## CIVIL THEFT
## AGAINST ALL DEFENDANTS

138.  Plaintiff investors incorporate by reference and reallege paragraphs 1 through 115 above as if set forth herein.

139.  By causing this pleading to be served upon the Defendants, Plaintiff investors thereby provide written notice of demand for repayment of the aforesaid fraudulently extracted funds which Defendants continue to withhold wrongfully from Plaintiff investors.  Unless repaid within thirty (30) days hereof, as required in accordance with Section 772.11 of the Florida Statutes, this cause of action for civil theft shall ripen and mature by operation of law.  Thus, no later than thirty (30) days from the date of service, Defendants shall be answerable for treble damages and attorneys fees by virtue of Section 772.11 of the Florida Statutes.

140.  The actions and omissions described in the foregoing paragraphs of this Complaint constitute "criminal activity" as defined in Florida Statutes s 772.102.  Defendants deliberately and intentionally misrepresented that investments and trading involving bank debentures were being undertaken on behalf of Plaintiff investors, and that Plaintiff investors had, in fact, during the "investment" period and would in the future reap enormous profits, all of which statements and representations were false at the time they were made.

141.  Defendants knowingly obtained, used, and endeavored to obtain or use the property of Plaintiff investors with the intent to temporarily or permanently deprive Plaintiffs of a right to the use or benefit of their substantial monies, and assured Plaintiff investors that the moneys

entrusted to Defendants would be invested in accordance with Defendants' representations. Further, Defendants appropriated Plaintiff investors substantial monies for their own use or the use of another person or entity not entitled to use those funds.

142. Defendants' multiple misrepresentations described above concerning the nature and success of the investments and trading in bank debentures caused Plaintiff investors to entrust and continue to entrust in the hands of Defendants considerable capital outlays designated for specific investments identified and recommended by Defendants, the sum of which totaled millions of dollars. Defendants' refusal to return Plaintiff investors' principal "investment," and even characterizing the entrustment of the millions of dollars designated for investment as a gift, was the ultimate final act of incomprehensible gall and duplicity.

143. In engaging in these actions, Defendants conspired to and did perpetrate a fraudulent sham upon Plaintiff investors. Defendants' actions and omissions constitute prohibited activities in a relationship in which Defendants were fiduciaries.

144. Defendants' actions constitute violations of Florida Statute s 812.014 and Florida Statute s 772.11, both of which entitle Plaintiff investors to three-fold their actual damages along with interest, attorneys' fees, and costs.

**WHEREFORE,** Plaintiffs pray for judgment as follows:

A. A judgment declaring the conduct of Defendants to be in violation of the law as set forth in Counts One through Five of the Complaint.

B. A judgment awarding Plaintiffs compensation for the damages which they have sustained as a result of the Defendants' unlawful conduct as set forth herein, including compensatory, consequential, and all other damages allowed by law.

C.  A judgment ordering the recission of all contracts made by Defendants and others concerning and pertaining to Plaintiff investors' funds.

D.  A judgment ordering the return of all of Plaintiffs' funds to Plaintiffs.

E.  A judgment awarding treble damages to Plaintiffs.

F.  A judgment awarding prejudgment interest to Plaintiffs.

G. A judgment awarding legal interest from date of judicial demand until paid to Plaintiffs.

H.  A judgment awarding reasonable attorneys' fees to Plaintiffs.

I..  A judgment awarding Plaintiffs all costs of these proceedings, including the costs of service of process, depositions, expert witness fees, and all other costs permitted by law.

J.  For such other and further relief as this Court may deem just.

Respectfully submitted,

**DONALD L. BECKNER & ASSOCIATES**

By: _____
      Donald L. Beckner (La. Bar No. 02924)
      Attorney at Law
      5800 One Perkins Place
      Building 7, Suite A
      Baton Rouge, Louisiana 70808
      Telephone: [225] 769-7779
      Fax: [225] 768-7884
      Counsel for Plaintiffs
      Pro Hac Vice Motion Pending

**KENDALL COFFEY, P. A.**

By: _____
      Kendall Coffey
      Florida Bar No. 259861
      200 Grand Bay Plaza
      2665 South Bayshore Drive
      Miami, Florida 33133
      Telephone: (305) 285-0800
      Facsimile:   (305) 285-0257

48



# EXTRACT FROM
# THE MINUTES OF THE SPECIAL GENERAL
# MEETINGOF MARCH 8 TH , 1999

The special general meeting of the CREAI ACTION SERVICE is organised on March 8th 1999 , in the registered office : 66 rue Caumartin under the presidency of Mister Jean Pierre MARTINEZ. With the presence of the constituent members :

- Mister Férid BENZAID          Secretary
- Mister Dominique GUERVILLE  Treasurer

The meeting can legitimatly deliberate and the session is open at 9 a.m.

## BUSINESS OF THE DAY :

- Arrangement for the setting-up of the humanitory cooperation project in INDIA.
-

No remark has been raised, the business of the day is adopted.

After having listened to Mister Martinez's talk, concerning the complete actions which have to be executed for the setting-up of the humanitory project in INDIA within the period of time agreed upon with our partners, and following the General meeting of February 17 th, the members

## DELIBERATE

and adopt unanimously the following resolutions

## FIRST RESOLUTION

It is accepted that our humanitory project in INDIA will be developed with the financial partnership of Mister Mark COHEN.

## THIRD RESOLUTION

Opening of a bank account in french francs at CIC PARIS for current operations with joint signatures of Mister MARTINEZ, President, and of Mister GUERVILLE, Treasurer

CREAI ACTION
SERVICE
66 RUE CAUMARTIN
75009 PARIS

EXHIBIT
A

**FOURTH RESOLUTION**
Mister Mark COHEN AND Mister Charles WEAVER are appointed as Special financial
Managers of CREAI ACTION SERVICE

**FITH RESOLUTION**
Opening of a bank account in USD at CIC PARIS, essencial for the management of our
project in INDIA. This account will requires, for all operations, the joint signatures of the
President Mister MARTINEZ and of the Special Financial Manager Mister Mark COHEN, or
of the President Mister MARTINEZ and of the Special Financial Manager Mister Charles
WEAVER.

**SIXTH RESOLUTION**
The funds belonging to the C.A.S. association on the USD account at CIC PARIS will be
reserved for the financial operations allowing the develpment of our humanitory cooperation
project in INDIA. This operation is carried out with the SUMMERFIELD Company
represented by Mister Mark COHEN and Mister Charles WEATHER.

**SEVENTH RESOLUTION**
The total amount of the funds which will be transfered to the account of CREAI ACTION
SERVICE will be converted into USD for the needs of our operations in INDIA.
Mister Jean-Pierre MARTINEZ has full power to give order for buying USD Foreign
currency and to undertakeany financial placement that he will estimate as useful ( SICAV,
and other financial instruments°

**HEIGHTH RESOLUTION**
The profits generated by the immobilization of the funds in the USD accounts at CIC PARIS
will be immediatly transfered on a monthly basis in favor of Mister Paul MORATO to the
account of his choise in order to enable him to fulfil his obligations and the payment of the
charges and costs related to the setting-up of the humanitory project in INDIA, with the
collaboration of local and govermental responsible people.

A full power is given to :

-Mister MARTINEZ

in order to execute all the steps and sign all documents in relation with these different
operations

The business of the day having been totaly covered, the meeting is finished at 12 a.m..

The present minutes have been put down in writing from all what has been stated here above,
and have been signed by the President.

CREAI ACTION
SERVICE
66 RUE C\UMARTIN
75009 PARIS•0  ' 8\        Jean-Pierre MARTINEZ
                           President of the C.A.S.

# FROM THE DESK OF .............MICHAEL J SWEET

| | | | | |
|---|---|---|---|---|
| DATE: | 07 MARCH, 1999    London 1:30 PM | | | |
| TO: | MARK COHEN | FAX: | 001 561 988 9694 | |
| FROM: | MICHAEL SWEET | FAX: | +44 181 886 7447 | |
| RE: | CREAI ACTION SERVICES | | | |

Dear Mark,

As a consequence of your advice dated 06/03/99 at 7:41 am that David's Investor has pulled out **immediate action was taken by the Financial Dept. of CRRAI in France**.

You are aware that continued delay is not possible and that at the end of next week further erosion of funds available may be necessary from the French side. **US$6 million now is current**.

The committee yesterday recalled Mr. Martinez from Spain and a new structure to replace DAHARA as the trading vehicle was approved thus satisfying tax implications through USA trading.

## THE NEW ENTITY IS – CREAI ACTION SERVICE

With the same Charities Status as the main body.

### Mr. Jean-Pierre MARTINEZ – President

### Mr. Mark Cohen – Treasurer

Joint signing authority on the account to be available at CIC Bank.

The fund position at present is: -

CREAI account ..............................US$ 6.0 million
CREAI-COHEN .........................US$ 1.0 million

Balance..............................................US$ 7.0 million

Funds on transfer already sent to CREAI-COHEN Account.

a).     From First Union National – Sarasota Florida...........................US$ 1.75 million

b).     From Anglo-Irish Republic – Dublin, Ireland............................US$ 0.20 million

SUB-TOTAL................US$ 1.95 million

1

EXHIBIT

B

FROM THE DESK OF ............................ ...... MICHAEL J SWEET

## TO BE SENT

a).    Anglo Irish Republic -- Dublin ...................................................... US$ 0.05 million

TOTAL ...................... **US$ 2.0 million**

**The funds should be in Paris** – Monday/Tuesday 8/9 March to CREAI – COHEN existing account.

**Balance total jointly: US$ 9 million.**

Your advice on the US$ 4.8 million Rothschild instruction is that these funds were diverted to SWISS SECURITY TRUST BANK and you have no proof of arrival at that bank until at least Monday 8th March 99.

In terms of your earlier advice the French are expecting your input at ......... US$   8.00 million
Current input .................................................................................................. US$   2.95 million

Shortfall ............................................................................................................ US$   5.05 million

## NEW ACCOUNT

At 5th March 1999 the new account procedure for your Personal Account opening was forwarded. **The PROCEDURE is essential to be followed:**

Mr. Paul Morato has requested that you (if possible) stop the action of sending a copy of signature card direct from your City Bank to CIC in Paris and please follow the format for account opening advised.

Format for account opening advised.

You need the Personal Account for future funds. Mark – this transaction is held very close to the chest and our PROCEDURE has to be precise. As to the Bank Reference (personal received from Citibank) it will not be submitted.

Your advised that you are able to have this – REPRODUCED (it is not necessary to show average balances) put simply – balance only distract in terms of the funds we are working with).

Upon receipt of your funds they will upon instruction AMALGAMATE into **the CREAI ACTION SERVICE's account.** This account will become the trading identity **REPLACING DAHARA.**

Should DAHARA eventually receive their funds, they already have approval to open an account, which can then be added to the CREAI ACTION SERVICE identity.

Mark – due to this arrangement the Resolution of appointment for Special Activity has been made simple and effective.

FROM THE DESK OF .............. ...............MICHAEL J SWEET

1. As Treasurer you are easily identified.
2. You and Mr. Martinez can sign the Agreement Summerfield and CREAI ACTIVE SERVICE.
3. The same principle applies for LOC.
4. Future depositors' accounts can be made available at CIC.
5. Taxation in America – Geneva – London etc. has no bearing.
6. CREAI aim objectives projects are all HUMANITARIAN and acceptable to World Bank and IMF requirements in terms of the funding.

RE: DAHARA – I believe you need to work out things with David and Christopher in **this new arrangement**, but simply put.

CREAI is not in a position or prepared to keep on being **DELAYED** and losing interest on their funds. They are the prime key for the future **PROGRAM NEGOTIONS** – RESERVE LETTER.

Mark in these new capacity program negotiations can be carried forward with authority.

The finalisation of your funds is CRITICAL to going forward this week – and the INSTRUCTION THAT YOU PROPOSE INSTRUCTING THE CIC BANKER TO RESERVE THE FUNDS FOR A SPECIFIC TRANSACTION is not a document that just appear "out of the blue".
It must be that you obtain a draft of the Letter and allow us to negotiate the position through Paul and Mr. Berdalay his approval before it issues is essential.

Please do not think otherwise and it will be appreciated if you can fax Jeffrey and me in London before sending through to Paul as that there are no misunderstandings.

Travelling arrangements -- talk to you later today.

Kind regards,

Michael Sweet

3

| To: Paul Morato | From: Mark Cohen |
|---|---|
| Fax #: 011-33-14-3641556 | Fax #: 561-988-9694 |
| Company: | Tel #: 561-997-2484 |

| Subject: | |
|---|---|
| Sent: 3/12/99 at 3:24:16 PM | Pages: 1 (including cover) |

## MESSAGE:

In response to your recent fax, two wires have been sent from First Union to CIC account:
(1) $1,749,980 and (2) $4,552.98. These should be there at the latest on Monday.

#250,000 was transferred from the Anglo-Irish account.

We want to transfer the last $3.8 million from SSBT where money was to sent to CIC. Please inform me what account number to send it to.

Thank you.

Mark Cohen

1

**EXHIBIT**

C

| To: Mike Sweet | From: Mark Cohen |
|---|---|
| Fax #: 011-44-181-8867447 | Fax #: 561-988-9694 |
| Company: | Tel #: 561-997-2484 |

| Subject: | |
|---|---|
| Sent: 3/13/99 at 2:05:40 PM | Pages: 1 (including cover) |

## MESSAGE:

Dear Paul,

Since I have not received new instructions from you I will have SSBT wire $3.8m Mon. morning to the CREAI-COHEN account and then the bank can move it internally. I also changed my flight when I found out that you would not be in Paris until Tue. morning. My flight will arrive at Charles De Gaul at 8:40 Tuesday morning. I want to sign all corporate paperwork and bank documents at that time and then fly to New York on Wed. morning so that I can go into the bank on Thurs. Please have the banker set aside time to meet with us on Tue. The banker must also agree to issue the reserved funds letter when we request it.

Warmest Regards,

Mark Cohen

EXHIBIT

D

OFFSHORE DEPOSIT AGREEMENT

Strictly confidential

EXHIBIT A

Company Resolution of

---

(the 'Corporation")

The undersigned hereby certifies that a special meeting of its Directors was held this _17_ day of _MARS_ , 1999 in accordance with its by-laws and regulation, and a quorum was present  There was adopted by unanimous vote, and recorded in the minutes of the meeting, a resolution of which the following is a true copy. The meeting was called for the purpose of (1) considering general investment transaction for the Corporation and investment agreements relative thereto, as well as certain other commercial undertakings in connection therewith (hereinafter sometimes referred to as "Investment Opportunities") and the transfer of assets of the Corporation, more particularly described in Attachment 2 attached hereto (hereinafter referred to as the "Assets"), to an account or accounts in the name of the Corporation at a designated bank or banks and (ii) authorising Mark Cohen and Charles Weaver to represent the interests of the Corporation in a limited capacity in connection with such General Investments Transactions or Investment Opportunities, as follows: •

**RESOLVED**, that the Directors of the Corporation appoint Mark Cohen, United States Passport number 040546919, and Charles Weaver, United States Passport number 014553566, as nonvoting special director representatives (hereinafter referred to as "Special Director") of the Board of Directors of the Corporation to negotiate and to take all the necessary steps for the purpose of conducting General Investment Transactions with respect to the Assets, subject to the limitations set forth on Attachment 1 hereto, acting jointly or individually.

**RESOLVED**, that a Letter of Intent, Affidavit, Corporation History and Asset History have been or shall be prepared and provided to Summerfield International Services, Inc. (hereinafter referred to as "Summerfield") with respect to these transactions.

**RESOLVED**, that the above name Special Directors are authorised to act as signatories for the Corporation on all matters in connection with such Investment Opportunities, either jointly or individually, subject to the limitations set forth on Attachment 1 attached hereto, and that this authority shall continue so long as the Corporation is engaged in Investment Opportunities with Summerfield.

This Resolution was adopted and approved as the official act of the Corporation by adoption of the Directors on the day above indicated, is now in full force and effect and is not contrary to or inconsistent with any provision in the Certificate of Incorporation (or other organisational documents), By Laws or regulations of the Corporation, or its enabling legislation.

Signature and Title : JEAN - PIERRE. HARTINEZ  PRÉSIDENT

Passport Number : 95CZ 35193 ( FRANCE )

Date Signed  17 MARS 1999

CREAI ACTION
SERVICE
65 RUE CAUMARTIN
75009 PARIS•0 4:8593174

EXHIBIT
E



# POWER OF ATTORNEY
# POUVOIRS

For internal reasons and for extreme urgency, and during my absences, the signatory Mark Edward COHEN, Financial Manager of C.A.S, passport number 045046919, gives by this document full power of attorney to Jean Pierre MARTINEZ, in order to allow him under his own signature to transfer C.A.S funds deposited on CIC PARIS account to the bank(s) of his choice through the structure(s) of his choice.

je soussigné Mark Edward COHEN, Directeur Financier de C.A.S, passeport N° 045046919, donne par la présente pour des raisons internes et de première urgence en mon absence, tous pouvoirs à Monsieur Jean Pierre MARTINEZ afin de lui permettre d'effectuer par sa seule signature le transfert des fonds C.A.S détenus par le CIC PARIS vers la (ou les) banque de son choix et au travers également de la (ou des) structure de son choix.

Pour servir et valoir se que de droit

Fait à Paris le 22 Mars 1999

Mark Edward COHEN

EXHIBIT
F

# BANQUE WORMS

AGENCE GEORGE V
47, Avenue George V - 75008 PARIS
Tél. : 01 40 73 03 00 - Fax : 01 40 73 03 01 - Télex 645 223

CREAI ACTION SERVICE
66 Rue Caumartin
75009 – PARIS

March 23, 1999

RE : Account balance verification for : A/C. 40-401-30666.H

To the attention of Mr. JP. MARTINEZ Président
      And of Mr. Mark COHEN Finance Director

Dear Sirs,

As of today there is, an equivalent value of USD 12.000.000 twelve millions USD in clear, available funds in the CREAI ACTION SERVICE account here at WORMS Bank Paris which is under your control as signatories on the CREAI ACTION SERVICE account.

Sincerely,

Signatory :
          1ᵉʳ OFFICER BANK

Title : Director
Name :  Emmanuel ROUSSEAU.

Signatory :
          2èem OFFICER BANK

Title :
Name :  Marie-Claude LABROQUERE.

Société Anonyme à Directoire et Conseil de Surveillance au Capital de 2.100.000.000 F
Siège Social : Tour Voltaire 1, Place des Degrés - La Défense 92800 Puteaux - SIREN 552 000 779 RCS Nanterre

EXHIBIT

G

# BANQUE WORMS

AGENCE GEORGE V
47, Avenue George V · 75008 PARIS
Tél. : 01 40 73 03 00 · Fax : 01 40 73 03 01 · Télex 645 223

**CREAI ACTION SERVICE**
**66 Rue Caumartin**
**75009 – PARIS**

Avril 1st, 1999

RE : Account balance verification for :

**To the attention of Mr. JP. MARTINEZ Président**
**And of Mr. Mark COHEN Finance Director**

Dear Sirs,

As of today there is, an equivalent value of USD 15.000.000 fifteen millions USD in clear, available funds in the CREAI ACTION SERVICE account n° 40.401.30666 S here at WORMS Bank Paris which is under your control as signatories on the CREAI ACTION SERVICE account.

Sincerely,

Signatory
1ᵉʳ OFFICER BANK

Title : Director
Name : Emmanuel ROUSSEAU

Signatory :
2ème OFFICER BANK

Title : Manager
Name : Marie-Claude LABROQUERE

EXHIBIT

*H*

PHONE NO. : 00 44 181 886 7447    Jun. 13 1999 11:10PM P01

# FROM THE DESK OF ..................................Michael J SWEET

☐ **BANGKOK**
☐ **SINGAPORE**

☐ **PERTH**
☒ **LONDON**
☐ **SEYCHELLES**

*URGENT*

---

TO : *MARK COHEN*    cc  *CHARLEY WEAVER*

FAX:

DATE : *SUNDAY 12 JUNE 99*

TEL:  *LONDON*

Time:  *11:00 pm*

---

DEAR MARK

I HAVE RECEIVED A COPY OF YOUR FAX TODAY TO PAUL MORATO.

YOU WILL REMEMBER THAT NO FAXES ARE TO BE SENT DIRECT TO PAUL IN FRANCE IN ENGLISH. ALL COMMUNICATION IS TO LONDON FOR TRANSLATION AND ADVICE AS PAUL DOES NOT SPEAK ENGLISH AND HE WORRIES THAT MISINTERPRETATION MAY OCCUR IF OTHER PARTIES VIEW THE FAX. IT IS A VERY SENSITIVE AND VOLATILE SITUATION AND WE HAVE HAD TO WORK HARD TODAY TO KEEP THE LID ON THROUGH THIS BREAKDOWN TODAY. PLEASE RESPECT OUR POSITION AT THIS MOMENT. THE FRENCH ARE VERY FOCUSED ON ONLY THEIR POSITION.

I HAVE LEFT MESSAGES TO YOU BOTH BUT HAVE NOT BEEN ABLE TO CONTACT AND WILL TRY TO GET YOU IN THE MORNING.

MARK — AMSTERDAM/BANKER/TRUST WAS TO CONTACT YOU THIS WEEKEND.

PLEASE CONFIRM YOUR TUESDAY FLIGHT FROM NEW YORK AND THAT YOUR ACCOMMODATION IS AT MARRIOTT GROSVENOR Sqr. THE FRENCH WILL COME TO LONDON AS DIRECTED BY THE CRETAI COMMITTEE — THEY ARE VERY SERIOUS ABOUT THIS TAKING PLACE

TALK TO YOU AS QUICKLY AS I CAN

KINDEST REGARDS

*MICHAEL*

**EXHIBIT**
*I*

# CIVIL COVER SHEET

## 01-8060

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**CIV - DIMITROULEAS**

**(a) PLAINTIFFS**

GREGORY J. HALL
ARCADIA RESOURCES, LTD.

**DEFENDANTS** DARIN COHEN, CHARLES H. WEAVER, CREAI
ACTION SERVICE, SUMMERFIELD INTERNA
SERVICE, SUMMERFIELD INTERNATIONAL SE
INC., MAJESTIC ROSE, INC., SENTRY OVERSEAS (BAHAMA
INC., T.M.I. GENERATING, CREAI-COHEN, A JOINT VENTUR

**MAGISTRATE JUDGE
JOHNSON**

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   CANADA
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

A-WPB|01CV 8060) Dimitrouleas   (Johnson)

**(c)** ATTORNEYS (FIRM NAME ADDRESS, AND TELEPHONE NUMBER)
KENDALL COFFEY, P.A., 2665 South Bayshore
Drive #200, Miami, FL 33133 (305) 285-0800

ATTORNEYS (IF KNOWN)

**(d)** CIRCLE COUNTY WHERE ACTION AROSE:  DADE,  MONROE,  BROWARD,  PALM BEACH,  MARTIN,  ST. LUCIE,  INDIAN RIVER,  OKEECHOBEE, HIGHLANDS

## II. BASIS OF JURISDICTION (PLACE AN 'X' IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☒ 3 Federal Question (U.S. Government Not a Party)

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN 'X' IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | A TORTS | | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | B☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury — | B☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med Malpractice | B☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC 881 | 28 USC 157 | B☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | B☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | B☐ 640 R.R. & Truck | **A PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers | Injury Product Liability | B☐ 650 Airline Regs | ☐ 820 Copyrights | Corrupt Organizations |
| B☐ 152 Recovery of Defaulted | Liability | | B☐ 660 Occupational | ☐ 830 Patent | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ |
| (Excl Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | B☐ 690 Other | | Exchange |
| B☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | **B SOCIAL SECURITY** | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **A LABOR** | ☐ 861 HIA (1395ff) | 12 USC 3410 |
| ☐ 160 Stockholders Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 863 DIWC DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| | | | ☐ 730 Labor/Mgmt. Reporting | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| **A REAL PROPERTY** | **A CIVIL RIGHTS** | **PRISONER PETITIONS** | & Disclosure Act | | ☐ 895 Freedom of |
| ☐ 210 Land Condemnation | ☐ 441 Voting | B☐ 510 Motions to Vacate | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | Information Act |
| B☐ 220 Foreclosure | ☐ 442 Employment | Sentence | | A☐ 870 Taxes (U.S. Plaintiff | ☐ 900 Appeal of Fee Determination |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **HABEAS CORPUS:** | ☐ 790 Other Labor Litigation | or Defendant) | Under Equal Access to Justice |
| ☐ 240 Torts to Land | Accommodations | A☐ 530 General | | A☐ 871 IRS – Third Party | ☐ 950 Constitutionality of |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | A☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc | 26 USC 7609 | State Statutes |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | B☐ 540 Mandamus & Other | Security Act | A OR B | ☐ 890 Other Statutory Actions |
| | | B☐ 550 Civil Rights | | | A OR B |
| | | ☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

THIS COMPLAINT INCLUDES CAUSES OF ACTION FOR FEDERAL VIOLATIONS OF SECURITIES LAWS AND PENDENT
STATE CLAIMS FOR SECURITIES VIOLATIONS, BREACH OF FIDUCIARY DUTY AND CIVIL THEFT.

LENGTH OF TRIAL
via 20 days estimated (for both sides to try entire case)

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

**DEMAND $** $11,100,000.0

CHECK YES only if demanded in complaint
**JURY DEMAND:** ☒ YES  ☐ NO

## VIII. RELATED CASE(S) IF ANY (See instructions)

JUDGE _____   DOCKET NUMBER _____

DATE   January 19, 2001

SIGNATURE OF ATTORNEY OF RECORD   Kendall Coffey

**FOR OFFICE USE ONLY**

RIFC CC   835665

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG JUDGE _____